**Opinion issued July 28, 2026**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-26-00184-CV**
**NO. 01-26-00186-CV**
**NO. 01-26-00400-CV**
**NO. 01-26-00401-CV**

————————————

**IN THE MATTER OF A.M., a Juvenile**

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 2024-00129J Amended, 2021-00131J Amended,**
**2024-03118J Amended, 2024-03119J Amended**

---

**MEMORANDUM OPINION**

This is a juvenile-certification accelerated appeal. The State filed four amended petitions alleging that A.M., a juvenile, engaged in delinquent conduct. Three of those petitions allege that A.M. committed aggravated assault with a deadly

weapon and one petition alleges that A.M. committed murder. The juvenile court waived jurisdiction and transferred the cases to district court for criminal proceedings.

A.M. raises three issues on appeal. In two issues relevant to all four cases, he challenges the sufficiency of the evidence to support the juvenile court's waiver decision and the juvenile court's denial of his request for an evidentiary hearing on his fitness to proceed. And in the murder case, he challenges the juvenile court's finding of probable cause.

We affirm.

## Background

On Christmas Eve 2023, Houston Police Department ("HPD") officers responded to an aggravated assault call at a convenience store in Houston. When they arrived, officers observed Toby Knight lying on the ground with multiple gunshot wounds. Knight told officers that an argument outside of the store led to the shooting. Officers also spoke to Tyrone Richard, a witness to the shooting, who confirmed Knight's account. Richard also stated that he tried to de-escalate the situation but was unsuccessful.

HPD Officer J. Garcia was assigned to investigate the aggravated assault and obtained the surveillance video from the convenience store. He testified at the hearing that he identified A.M. in that surveillance video and witnessed him arguing

2

with Knight and then shooting him. He testified that the surveillance video also showed A.M. retrieving a firearm prior to the shooting. He further testified that the surveillance footage showed Richard try to deescalate the dispute between Knight and A.M. and then showed Richard running away from the shooting. Garcia identified A.M. in court as the shooter depicted in surveillance video and testified that he was arrested later the same day at the same convenience store.

Almost a year later, and less than two months after A.M. was released from detention, on December 13, 2024, HPD Sergeant C. Ponder was assigned to a murder investigation involving A.M. at the same convenience store. In his investigation, Ponder learned that a man named Kevin Smith arrived at the store in a black Toyota Camry, which was driven by his wife, Faridah Davis. Smith went inside the store but was told to leave by the owner because of prior disagreements between the two men.

Ponder testified that he reviewed surveillance videos, which showed that, as Smith was getting into the passenger seat of his car after leaving the store, a man identified as Jaylon Thompson shot at Smith and his vehicle multiple times. As Smith then attempted to get out of his vehicle, A.M. began shooting at Smith and his vehicle from another direction. Neither Thompson nor A.M. shot Smith, but one of the bullets struck Davis in the forehead, killing her.

Ponder testified that he did not know yet which shooter's bullet caused Davis's death. But he testified that A.M. "fired 9 rounds into the Camry occupied by Ms. Davis. That's a harmful act." And he believed based on his review of the surveillance videos that A.M. and Thompson, who "both shot at [the] vehicle multiple times," acted together.

The State also presented the testimony of Dr. Toni Walker, a psychologist who conducted a psychological and forensic evaluation of A.M. Dr. Walker described her assessment of A.M., which was based on her interviews with him, his psychological and cognitive testing results, his probation and detention records, and other medical and education records.

Following the hearing, the juvenile court granted the State's motions to waive jurisdiction and transferred A.M.'s cases to the criminal district court.

A.M. timely brought this appeal.

**Waiver of Jurisdiction**

In two issues, A.M. argues that the trial court abused its discretion in waiving its jurisdiction because the trial court erred in its application of the factors bearing on the welfare of the community and because there was insufficient evidence to support the trial court's finding of probable cause to believe that A.M. committed felony murder.

4

## A.    Standard for Transfer to Adult Criminal District Court

Juvenile courts have exclusive original jurisdiction over cases involving delinquent conduct by those under seventeen years old. *See* TEX. FAM. CODE §§ 51.02(2), 51.03(a), 51.04(a).  Section 54.02 of the Texas Family Code governs transfers by a juvenile court to a criminal district court for criminal proceedings. Under Section 54.02(a), a juvenile court may waive its exclusive original jurisdiction and transfer a child to a criminal district court if:

> (1) the child is alleged to have violated a penal law of the grade of felony;
>
> (2) the child was:
>
>> (A) 14 years of age or older at the time he is alleged to have committed the offense, if the offense is . . . a felony of the first degree, and no adjudication hearing has been conducted concerning that offense; or
>>
>> (B) 15 years of age or older at the time the child is alleged to have committed the offense, if the offense is a felony of the second . . . degree . . . and no adjudication hearing has been conducted concerning that offense; and
>
> (3) after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.

TEX. FAM. CODE § 54.02(a); *see Bell v. State*, 649 S.W.3d 867, 886 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd).

5

A juvenile court waiving its jurisdiction must state its reasons or considerations for doing so. *Bell*, 649 S.W.3d at 887. That said, these reasons need not be "detailed, case-specific findings." *Id.* "A juvenile transfer order entered after the required transfer hearing [that] compl[ies] with the statutory requirements constitutes a valid waiver of jurisdiction even if the transfer order does not contain factually-supported, case-specific findings." *Ex parte Thomas*, 623 S.W.3d 370, 383 (Tex. Crim. App. 2021).

The juvenile court made findings for the section 54.02(a) factors for each offense. It found that (1) in each case A.M. was charged with a felony, (2) none of the offenses had been adjudicated, (3) for each offense, A.M. was fourteen years of age or older,[1] (4) there was probable cause A.M. committed each offense, (5) because of the seriousness of the offenses the welfare of the community required criminal proceedings, and (6) A.M.'s background required transfer to criminal district court for the welfare of the community. The juvenile court stated it

---

[1] Because the three aggravated assault offenses were second-degree felonies, the juvenile court's findings in the certification orders in those cause numbers should have reflected that A.M. was 15 years of age or older at the time of the commission of the alleged offenses. *See* TEX. FAM. CODE § 54.02(a)(2)(B). A.M. does not raise this discrepancy in his brief. And given that the parties stipulated to A.M.'s date of birth, no such challenge to these findings would be meritorious as it is undisputed that A.M. was 15 years of age or older at the time of the commission of the aggravated assault offenses.

6

considered each of the section 54.02(f) factors, but it did not make specific findings on these factors.

A.M. does not dispute the first three findings. He disputes the existence of probable cause, but only for the felony murder charge, which we address separately below. Thus, the only findings he challenges in all four cases are the fifth and sixth—i.e., that either the seriousness of the offense or his background required transfer to criminal district court for the welfare of the community. We address his welfare-of-the-community argument first below.

## B.     Welfare of the Community

A.M. argues that the juvenile court abused its discretion in the application of the statutory factors and the "welfare of the community" determination.

### 1.     Standard of Review and Applicable Law

The State has the burden to persuade the juvenile court by a preponderance of the evidence that the community's welfare requires transfer of jurisdiction over the child for criminal proceedings, either because of the seriousness of the offense alleged, the background of the defendant, or both. *Bell*, 649 S.W.3d at 886. In considering whether the preponderance of the evidence supports transfer under Section 54.02(a)(3), the juvenile court must consider, among other things, the following non-exclusive factors:

> (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

7

(2) the sophistication and maturity of the child;

(3) the record and previous history of the child; and

(4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

TEX. FAM. CODE § 54.02(f); *see also Bell*, 649 S.W.3d at 886.

We use a two-step analysis for reviewing a claim the evidence is insufficient to support a juvenile court's transfer decision. *Bell*, 649 S.W.3d at 887. First, we review the juvenile court's findings for legal and factual sufficiency. *Id.* For legal sufficiency we view the evidence in the light most favorable to the juvenile court's transfer order, disregarding all contrary evidence unless a rational fact finder could not, and ask whether there is a scintilla of evidence supporting the juvenile court's findings. *Id.* Under a factual sufficiency review, we consider all the evidence and ask whether the juvenile court's findings conflict with the great weight and preponderance of the evidence so as to be clearly wrong and unjust. *Id.*

If the evidence is legally and factually sufficient, we review the juvenile court's transfer decision for an abuse of discretion. *Id.* A juvenile court abuses its discretion if its decision is essentially arbitrary. *Id.* A juvenile court does not abuse its discretion if its decision represents a reasonably principled application of the legislative criteria. *Id.* It is the juvenile court's obligation to resolve conflicts in the evidence, and we will not reverse based on a conflict in evidence. *Id.*

8

## 2. Analysis

Here, A.M. contends that the evidence is insufficient to support the juvenile court's welfare-of-the-community findings because the evidence demonstrates that he is moderately intellectually disabled, has been found unfit to proceed on prior occasions, functions cognitively at the level of a young child, and has an extensive history of mental health diagnoses. And he argues that he should be protected and rehabilitated rather than subjected to the harshness of the criminal system.

First, we acknowledge that A.M. is correct that there was evidence introduced of his low IQ, impulsivity, and low cognitive functioning, evidence which is relevant to the sophistication and maturity factor. For instance, Dr. Walker testified that A.M.'s current full-scale IQ was 65, which fell in the extremely low range.[2] She testified that his level of maturity was lower than that of other juvenile offenders, while his impulsivity was high. She acknowledged that A.M. had been tested for fitness to proceed several times, and three times he was found to be unfit to proceed. And Dr. Walker further testified that A.M. is "moderately intellectually disabled," that academically he functions at the second-grade level, and that overall, it is possible he is "functioning at an elementary or early middle school age."

---

[2] Dr. Walker also testified that A.M. had been previously tested twice in 2022 and his full scale IQ at that time was 59 and 55.

But "I.Q. is only one element to be used to determine whether a juvenile is of sufficient sophistication and maturity to be tried as an adult." *In re K.D.S.*, 808 S.W.2d 299, 302–03 (Tex. App.—Houston [1st Dist.] 1991, no pet.). Courts also "place weight on whether there is evidence indicating that the juvenile does not know right from wrong . . . and whether the juvenile can assist his or her attorney in their defense." *In re K.J.*, 493 S.W.3d 140, 151 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citations omitted); *see also Bell*, 649 S.W.3d at 892. And evidence that the child understands the seriousness of the charge against him as well as the difference between adult and juvenile proceedings support a juvenile court's finding that the child's sophistication and maturity weigh in favor of transfer. *See Bell*, 649 S.W.3d at 893; *In re K.J.*, 493 S.W.3d at 151.

Here, while Dr. Walker acknowledged A.M.'s low I.Q. and cognitive functioning level, she also testified that A.M. does understand right from wrong. Additionally, she noted in her evaluation that A.M. stated he "would discuss with his attorney" in "deciding on a plea agreement, not understanding what is going on in court, and making decisions on whether he should testify." She also stated that A.M. knew the differences between having his case tried in the juvenile court versus adult court, including the severity of the punishment and that the adult court does not have detention hearings. And Dr. Walker concluded that A.M. has the "capacity to understand juvenile legal proceedings," the "factual knowledge and appreciation

10

of the nature of the allegations against him and the range of possible punishment," and "the capacity to communicate with his attorney and assist in his defense." *See Bell*, 649 S.W.3d at 892–93; *In re K.J.*, 493 S.W.3d at 151–52.

Thus, while there is some conflicting evidence on this factor, it was the juvenile court's obligation to resolve those conflicts, and we will not reverse based on a conflict in evidence. *See Bell*, 649 S.W.3d at 887; *In re A.P.*, — S.W.3d —, No. 01-25-00423-CV, 2025 WL 3454615, at *3 (Tex. App.—Houston [1st Dist.] Dec. 2, 2025, no pet.).

Furthermore, as this Court recently recognized, "[t]here is no requirement that the trial court specifically find the juvenile mature and sophisticated in order to support the waiver of jurisdiction." *In re A.P.*, 2025 WL 3454615, at *3 (citation omitted). "Any combination of these factors may suffice to support a waiver of the juvenile court's exclusive original jurisdiction and not every factor need weigh in favor of transfer to the criminal district court." *Id.* (quoting *Bell*, 649 S.W.3d at 886–87). As Section 54.02(a)(3) is phrased in the disjunctive, it allows "the juvenile court to base its determination of what the welfare of the community requires on either the seriousness of the offense *or* the background of the juvenile; it need not find that both necessitate criminal proceedings." *Id.* (emphasis added).[3] And the

---

[3] "The nature and seriousness of the specific alleged offense, alone, may justify the juvenile court's waiver of jurisdiction notwithstanding other section 54.02(f) factors, so long as the offense: (1) is substantiated by evidence at the transfer

11

evidence of the other factors is both legally and factually sufficient to support the juvenile court's decision.

The first factor the juvenile court must consider is whether the alleged offense was against a person or property, with offenses against persons weighing heavily in favor of transfer. *See Bell*, 649 S.W.3d at 889–90. All of the charged offenses are serious felonies committed against persons, not property. *See id.*; *In re A.P.*, 2025 WL 3454615, at *3. Each of the incidents involved A.M.'s use of a firearm, with three of the complainants being either shot or shot at by A.M. And A.M. does not dispute that because these offenses constituted offenses against persons, this factor weighed in favor of transfer. *See Bell*, 649 S.W.3d at 890.

As to the third factor, A.M.'s "record and previous history," Dr. Walker testified that A.M. has had ten referrals to the juvenile system in Harris County; seven of which were pending at the time of the certification hearing. Four of those seven are the charges at issue in this case. The second incident, which resulted in the murder charge for the death of Davis, occurred almost exactly one year after the first incident and while the charges from the first incident were pending.

A.M. also has a prior referral for burglary of a habitation, which resulted from an allegation that A.M. pushed his girlfriend and kicked her in the head. He then

hearing, and (2) is of sufficiently egregious character." *In re Z.M.*, No. 02-21-00213-CV, 2021 WL 4898851, at *5 (Tex. App.—Fort Worth Oct. 21, 2021, no pet.) (mem. op.) (citations and quotations omitted).

fled her house, returned later through a window, and pointed a gun in her face and fired it, but the gun jammed. The referral report stated that, while attempting to shoot his girlfriend, A.M. allegedly said, "I'm going to kill you, bitch."

Dr. Walker also testified that A.M. was currently detained at the Harris County Jail for assaulting a peace officer while in the Juvenile Detention Center. A.M. was involved in the assault of another juvenile at the detention center when staff members tried to protect that juvenile, A.M. allegedly kicked the staff member. It was also alleged that A.M. initiated the assault on the juvenile. Finally, Dr. Walker testified that during his most recent detainment—from December 2024 until October 2025—A.M. has accrued 21 major rule violations, which included 7 physical altercations, possession of contraband, verbal threats, aggression, and destruction of County property.

A.M.'s behavior while in the Juvenile Detention Center, including various violent and physical altercations, coupled with the violent nature of the four felonies at issue here and several of A.M.'s other referrals, demonstrates that A.M.'s violent behaviors are continuing, if not escalating. We conclude that this evidence of A.M.'s record and history therefore weighs in favor of transfer. *See, e.g.*, *In re K.J.*, 493 S.W.3d at 152–53 (concluding that appellant's violent behavior while detained and

violent nature of his latest three felonies supported juvenile court's conclusion that appellant's record and history weighed in favor of transfer).[4]

Turning to the fourth factor, protection of the public and A.M.'s likelihood of rehabilitation, courts consider the age of the child at the time of the transfer hearing. This is relevant to the "likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court because the resources of the juvenile court are designed to assist and rehabilitate children, not adults." *Bell*, 649 S.W.3d at 896–97 (quotation omitted). At the time of the transfer hearing, A.M. was less than two weeks away from his eighteenth birthday—almost an adult.

Also relevant to this factor is the success of any previous attempts to rehabilitate the juvenile. *See In re K.J.*, 493 S.W.3d at 153–54. As noted above, A.M. has had numerous referrals to the juvenile system, "in addition to treatment and intervention services in the community, juvenile justice facilities, and the state hospital." Dr. Walker testified that although A.M. had successfully completed diversion and deferred prosecution in the past, he "has shown poor compliance on pre-adjudication supervision . . . as well as poor compliance with his ankle monitor."

---

[4] *See also Bell v. State*, 649 S.W.3d 867, 895 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd) ("[T]he juvenile court may consider . . . rule infractions while the child is in the juvenile detention facility following the commission of the offense in determining whether the child's record and previous history weigh in favor of transfer.").

14

"Based on his behavior and responses in the interview, [A.M.] expressed a poor attitude about supervision and did not perceive it to be beneficial to him."

Dr. Walker acknowledged that there were "noted improvements in [A.M.'s] compliance and engagement in treatment in secure settings, [but] his continued behavioral problems are a hinderance to his rehabilitation." Further, "[g]iven that he frequently returned to negative environments and continued to engage in delinquent behavior despite increased super[]vision and monitoring by the department, there are concerns about his ability to make these substantial lifestyle changes." Finally, Dr. Walker testified that A.M.'s treatment amenability "fell at a below average level," and that, without any treatment or legal consequences, his risk for violent reoffending was high.

Finally, the juvenile court may consider the serious nature of the charged offense in determining whether the protection of the public and the likelihood that the child can be rehabilitated weigh in favor of transfer. *See Bell*, 649 S.W.3d at 897. As noted above, all four of A.M.'s charges are for serious, violent felonies and involve his possession or use of a firearm. And he is alleged to have participated in the December 2024 aggravated assault and murder only a few weeks after being released from detention for the December 2023 aggravated assaults.

Accordingly, considering that A.M. was less than two weeks away from adulthood at the time of the hearing, the serious nature of the charged offenses, and

15

the lack of prior success in previous attempts to rehabilitate him, we conclude that this evidence weighs in favor of transfer.

Based on the above, there is more than a scintilla of evidence to support the trial court's finding that because of the seriousness of the charged offenses *or* A.M.'s background, the welfare of the community requires criminal proceedings. *See In re A.P.*, 2025 WL 3454615, at *3; *Bell*, 649 S.W.3d at 889–90, 897. And the juvenile court's findings are not so against the great weight and preponderance of the evidence as to be unjust. *See In re A.P.*, 2025 WL 3454615, at *4; *Bell*, 649 S.W.3d at 897. Accordingly, we hold that the juvenile court's findings are supported by legally and factually sufficient evidence.

## C.    Probable Cause

A.M. also challenges the juvenile court's finding that there was probable cause to believe he committed the offense of felony murder because causation was not shown.[5]

### 1.    Standard of Review and Applicable Law

A transfer hearing is not held for the purpose of determining guilt or innocence; it is held for the purpose of establishing whether the child's and society's best interests are met by maintaining custody of the child in the juvenile system or

---

[5]    This argument applies only to appellate cause number 01-26-00401-CR and trial court cause number 2024-03118j amended.

by transferring the child to a criminal district court for trial as an adult. *In re B.M.*, No. 01-18-00898-CV, 2019 WL 1388561, at *8 (Tex. App.—Houston [1st Dist.] Mar. 28, 2019, no pet.) (mem. op.). Thus, the juvenile court needs only to determine whether there is probable cause that the child committed the offenses charged. *See id.*

Although A.M. asks us to evaluate the legal and factual sufficiency of the juvenile court's probable cause determination, we recently clarified that probable cause is a question of law, not a finding of fact subject to sufficiency review. *See In re A.P.*, 2025 WL 3454615, at *4. If the facts giving rise to probable cause are contradicted, then appellate courts treat it as a mixed question of law and fact, deferring to any findings of fact the factfinder made but reviewing de novo the application of those facts to the law. *Id.* (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). If there are no disputed facts, as here, then probable cause is a question of law to be decided by the court and is subject to de novo review.[6] *Id.*

Probable cause is the legal standard evidence must meet to justify the issuance of a search or arrest warrant or the initiation of criminal proceedings. *See* U.S.

---

[6] Although A.M. may contest the conclusions drawn from the facts and his ultimate guilt, there is no dispute about the existence of the facts of the police investigation, i.e., the surveillance video and what witnesses told police. *See In re A.P.*, — S.W.3d —, No. 01-25-00423-CV, 2025 WL 3454615, at *5 n.3 (Tex. App.—Houston [1st Dist.] Dec. 2, 2025, no pet.) (citing *Garza v. State*, 126 S.W.3d 79, 86 (Tex. Crim. App. 2004)).

CONST. amend. IV; TEX. CONST. art. I, § 9. Probable cause exists where there is reasonably trustworthy information sufficient to warrant a reasonable person to believe a particular person has committed an offense. *Guzman*, 955 S.W.2d at 87. "Probable cause deals with probabilities; it requires more than mere suspicion but far less evidence than that needed to support a conviction or even that needed to support a finding by a preponderance of the evidence." *Id.* Probable cause is determined not by individual facts but by the totality of the circumstances. *See id.* at 90–91.

## 2. Analysis

A.M. argues that the State must prove causation, i.e., that the dangerous act caused the death of the complainant, for felony murder.[7] And because the evidence showed that Davis was killed by one shot to the head and that it was likely Thompson and not A.M. that fired that shot, the State failed to carry its burden of proof to establish a causal connection between Davis's death and A.M.'s actions. We disagree.

---

[7] To support a conviction for felony murder, the State must prove (1) an underlying felony, (2) an act clearly dangerous to human life, (3) the death of an individual, (4) causation (the dangerous act causes the death), and (5) a connection between the underlying felony and the dangerous act ("in the course of and in furtherance of . . . or in immediate flight from"). *See Contreras v. State*, 312 S.W.3d 566, 583–84 (Tex. Crim. App. 2010); *see also* TEX. PENAL CODE § 19.02(b)(3).

18

As an initial point, we note that at this stage in the proceedings the juvenile court need only determine there is probable cause that A.M. committed felony murder. Thus, the State was not required to prove all elements—including causation—beyond a reasonable doubt. Keeping that standard in mind, from the totality of the circumstances here, we conclude that a reasonable person could believe there is a fair probability that A.M. committed felony murder or acted as a party to felony murder.

Surveillance video footage from the night of December 13, 2024, put Thompson and A.M. inside the convenience store before the shooting occurred and showed A.M. wearing a black hoodie and black pants with white stripes. Another video showed Smith arriving at the store in a black Toyota Camry, going inside the store, and, after several minutes inside, exiting the store and walking to the Camry. According to Sergeant Ponder, witnesses told him that Smith was told to leave by the owner because of prior disagreements between the two men.

The surveillance video showed Thompson shoot at Smith multiple times as he was getting into the passenger seat of his car after leaving the store. Another video showed A.M. (still wearing the same clothes) shooting at Smith as he attempted to get out of his vehicle after being shot at multiple times by Thompson. The videos also show Thompson and A.M. leaving the scene in the same direction. Although Smith was not hit, Davis sustained a single, fatal gunshot wound to the head.

19

One of the clerks from the convenience store identified the two shooters as Thompson and "Sambo," a nickname that Sergeant Ponder was able to later connect to A.M. Thompson, who had been friends with A.M. since middle school, turned himself into police and identified A.M. as the other shooter. Thompson told Sergeant Ponder that he thought A.M. shot "because he seen me shot." And Sergeant Ponder testified that he believed A.M. and Thompson, who "both shot at [the] vehicle multiple times," acted together.

Sergeant Ponder testified that he was waiting on the ballistics report and, at this stage, could not determine which bullet, Thompson's or A.M.'s, struck Davis and killed her. When questioned on cross examination, Sergeant Ponder agreed that both the lead slug and the copper jacket of the bullet were recovered from Davis's skull, meaning that the projectile likely separated before it struck Davis. He also agreed that it was likely, based on the separation of the bullet, that it struck something else before hitting Davis. But he could not definitively state what it hit.[8]

---

[8]   A.M.'s counsel argued that the evidence showed that the bullet that killed Davis hit the passenger side window first, causing it to separate into the slug and the copper jacket. And, because the surveillance video showed that it was Thompson's shot that shattered the passenger window, this meant it was Thompson who must have shot and killed Davis. A.M.'s counsel sought to introduce the testimony of the medical examiner, who he proffered would have testified that "the gun shot wound struck Ms. Davis in the face contemporaneously with glass particles that cause pseudo stippling," that when the bullet struck, "[i]t caused an intact piece of passenger window . . . to particalize, and pieces of that particle glass would fly in the same direction as the projectile," that "the flying of the glass would necessitate an intact pane of glass in the passenger window," and that "the glass was shattered contemporaneously with the bullet that struck [Davis] in the face." The juvenile

20

Nor could he definitively state from what angle the shot that killed Davis came from, especially considering that the positions of Davis and the other occupants of the Camry could not be determined. He reiterated that he believed it was possible that either Thompson or A.M. could have shot Davis.

Considering the above evidence, we conclude that the totality of the circumstances creates a reasonable inference that A.M. committed felony murder or acted as a party along with Thompson, even if he was not ultimately the shooter, in

court excluded this testimony from the hearing, concluding that it was irrelevant to the probable cause determination.

In connection with his probable cause argument on appeal, A.M. contends that the juvenile court abused its discretion by excluding the medical examiner's testimony because it was relevant to causation and probable cause. We disagree. A.M.'s argument fails to acknowledge that the totality of the circumstances supports a conclusion that there was probable cause that A.M. acted as a party, along with Thompson, in the commission of this murder, even if he ultimately was not the shooter. *See* TEX. PENAL CODE § 7.02(a)(2) ("A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."), (b) ("If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy."); *In re B.M.*, No. 01-18-00898-CV, 2019 WL 1388561, at *14 (Tex. App.—Houston [1st Dist.] Mar. 28, 2019, no pet.) (mem. op.) (noting that juvenile court may make its probable-cause finding based on the law of parties).

A.M. does not address the applicability of the law of the parties, despite that theory being raised by the State below. As that theory could have supported the juvenile court's probable-cause determination, even considering the medical examiner's testimony, we conclude that the trial court did not abuse its discretion by excluding this testimony.

the commission of felony murder. *See* TEX. PENAL CODE §§ 7.02(a)(2), (b), 19.02(b)(3); *see also In re A.P.*, 2025 WL 3454615, at \*6 (holding that there was probable cause that appellant, who was not shooter, acted as party to capital murder because evidence showed appellant on scene at time of shooting, he stopped at victim's body seconds after shooting, he and shooter left scene in same direction, and victim's property was found at location where appellant and shooter went after shooting). And we therefore hold that there is probable cause to believe that A.M. committed felony murder.

Finally, we note that the juvenile court conducted an adversarial hearing, heard evidence relevant to the statutory factors, made findings about the statutory factors, stated it considered all required factors, and ruled consistently with those findings and the evidence as described above. *In re A.P.*, 2025 WL 3454615, at \*4. Accordingly, we hold that the juvenile court's ultimate decision to waive jurisdiction and transfer A.M. to criminal district court was not an abuse of discretion. *See id.*

**Evidentiary Hearing on Fitness to Proceed**

In a third issue, A.M. argues that the juvenile court abused its discretion by overruling his objections to proceeding with the certification hearing without an evidentiary hearing on his fitness to proceed.

22

## A.    Relevant Background

In early January 2024, the State filed two petitions alleging that A.M. engaged in delinquent conduct by committing aggravated assault with a deadly weapon against both Knight and Richard.  Because A.M. had been previously diagnosed with an intellectual disability, a fitness-to-proceed evaluation was recommended.  On February 7, 2024, in accordance with Family Code sections 55.32 and 55.33, the juvenile court[9] determined that A.M. was unfit to proceed, placed A.M. in the custody of the Texas Department of State Health Services, and ordered the placement facility to submit a report pursuant to Family Code section 55.35. *See* TEX. FAM. CODE §§ 55.32, 55.33, 55.35.

A.M. was placed at Mexia State Supported Living Center to receive services in an attempt to restore his fitness.  After several weeks of treatment, Dr. Randy J. Smith, a forensic and clinical psychologist at that facility, evaluated A.M. and authored a report, dated October 22, 2024, in which he determined that A.M. was fit to proceed.  As required by Section 55.35, the report was sent to the juvenile court, the State, and A.M.'s counsel. *See id*. § 55.35(b), (e).  No objection to Dr. Smith's

---

[9]     This order was signed by the presiding judge of the 314th District Court, where Cause Number 2024-00129J and 2024-00131J (the two aggravated assault charges from December 2023) were originally filed.  It is not clear when, but at some point after petitions were filed in 2024-03118J and 2024-03119J (the aggravated assault and murder charges from December 2024) in the 313th District Court, Cause Numbers 2024-00129J and 2024-00131J were transferred to the 313th District Court.

23

report appears in the record. *See id.* § 55.36(a), (b). A.M. was discharged from the facility and returned to the Harris County Juvenile Detention Center. Shortly thereafter, the juvenile court found that A.M.'s "fitness ha[d] been restored" and that he was "ready to proceed," and ordered his release from custody. *See id.* § 55.36(a).

In July 2025, six months after the State filed its two petitions alleging that A.M. engaged in delinquent conduct for the aggravated assault of Smith and the murder of Davis, A.M. filed a motion for evaluation and determination of fitness to proceed, citing his intellectual disability. *See id.* § 55.31(b). That same day, the juvenile court found that probable cause existed to believe that A.M. may be unfit to proceed due to intellectual disability, granted a temporary stay, and ordered a fitness evaluation under Texas Family Code section 55.04. *See id.* § 55.31(c).

On September 4, 2025, Dr. Linda Wittig, a psychologist at the Harris Center, conducted a fitness to proceed evaluation of A.M., determined that he was fit to proceed, and issued a report with her findings. On September 29, 2025, the State filed amended petitions in all four cause numbers and moved in each case for the juvenile court to waive its jurisdiction and certify the proceedings to criminal district court.

At the beginning of the certification hearing, A.M. objected to proceeding on the State's motions to waive jurisdiction and requested a stay for an evidentiary

24

hearing on whether he was fit to proceed, as well as funds for an independent expert. The trial court denied his requests and proceeded with the hearing.

## B.    Analysis

A.M. argues that the trial court's decision to deny both the stay and the evidentiary hearing was an abuse of discretion in light of the uncontested evidence of prior adverse fitness determinations. He contends that granting such relief would have complied with the statutory language identifying the juvenile's "intellectual disability" as a factor to be addressed before disposition of a juvenile's rights. *See id.* § 55.31(a). Because the juvenile court complied with the applicable statutes, we disagree.

Section 55.31(a) provides that "[a] child alleged by petition . . . to have engaged in delinquent conduct . . . who as a result of . . . an intellectual disability lacks capacity to understand the proceedings in juvenile court or to assist in the child's own defense is unfit to proceed and shall not be subjected to discretionary transfer to criminal court . . . as long as such incapacity endures." *See id.* If the juvenile court determines that probable cause exists to believe that the child is unfit to proceed, the court shall temporarily stay the proceedings and immediately order the child to be examined under Section 55.04. *See id.* § 55.31(c).

A fitness-to-proceed hearing is only required if, "[a]fter considering all relevant information, including information obtained from an examination under

Section 55.04 . . . the court determines that evidence exists to support a finding that the child is unfit to proceed." *Id.* § 55.31(f)(1); *see also id.* § 55.32.  If, after that hearing, the juvenile court determines under section 55.32 that the child is unfit to proceed, then the court shall order the child placed with the Health and Human Services Commission for treatment. *See id.* §§ 55.32, 55.33(a)(1).  The facility is thereafter required to submit a report to the court describing the treatment the child received and stating whether the child is fit or unfit to proceed. *See id.* § 55.35(b).  If that report states that the child is fit to proceed, "the juvenile court *shall find* that the child is fit to proceed *unless* the child's attorney objects" within two days of receipt of the report. *See id.* § 55.36(a) (emphasis added).  If the child's attorney timely objects to the report, then the juvenile court "shall promptly hold a hearing to determine whether the child is fit to proceed." *Id.* § 55.36(b).

But if the juvenile court makes the initial determination under section 55.31(f)(2) that evidence *does not exist* to support a finding that the child is unfit to proceed, then "the court shall . . . dissolve the stay and continue the juvenile court proceedings." *Id.* § 55.31(f)(2).  And no hearing under either section 55.32 or 55.36 is required.

Here, although another juvenile court previously found A.M. to be unfit to proceed and placed him in the Mexia State Supported Living Center for treatment in February 2024, Dr. Smith evaluated A.M. and concluded in his October 2024

26

statutorily-required report that A.M. was fit to proceed. *See id.* § 55.35(b). And A.M. did not object to that report. *See id.* § 55.36(a), (b). Without an objection to Dr. Smith's report from A.M., the juvenile court was required to "find that [A.M.] [wa]s fit to proceed." *See id.* § 55.36(a). The juvenile court did so and released him from custody in October 2024. No further hearing was required. *See id.* § 55.36(a), (b).

And although the juvenile court below, proceeding under section 55.31, later found in July 2025 that there was probable cause to believe that A.M. was unfit to proceed and ordered an examination under section 55.04, that examination, conducted by Dr. Wittig in September 2025, resulted in her determination that A.M. was fit to proceed. A.M. did not point to any new evidence of his unfitness to proceed at the time of the certification hearing. By denying A.M.'s requests for a stay and a hearing on fitness to proceed at the start of the certification hearing, the trial court impliedly determined that evidence did not exist to support a finding that A.M. was unfit to proceed and "dissolve[d] the stay and continue[d] the juvenile court proceedings," as it was required to do under section 55.31(f)(2). *See id.* § 55.31(f)(2). No hearing was required. *See id.* § 55.31(f).

We hold that the trial court did not abuse its discretion in denying A.M.'s requests for a stay, for a hearing on fitness to proceed, and for an independent expert.

## Conclusion

For all of the reasons above, we affirm the juvenile court's judgments waiving its exclusive jurisdiction and transferring the cases to criminal district court.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Rivas-Molloy and Guiney